UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **FREDRICK OLSON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:25-cv-00774 |
| | § | |
| **MICROSOFT CORPORATION,** | § | |
| | § | |
| Defendant. | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT

NOW COMES Plaintiff Fredrick Olson, by and through the undersigned counsel, complaining of Defendant Microsoft Corporation, and would respectfully show the Court as follows:

### PARTIES, JURISDICTION, AND VENUE

1.  Plaintiff Fredrick Olson ("Mr. Olson") is a resident of Dallas, Texas.

2.  Mr. Olson is a former employee of Defendant Microsoft Corporation ("Microsoft") who predominantly worked remotely.

3.  Defendant Microsoft Corporation ("Microsoft") is a Washington Corporation with a principal place of business located in Redmond, Washington. Microsoft may be served with citation by serving its registered agent, Corporation Service Company dba CSC - Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620, Austin, TX 78701, or wherever it may be found.

4.  This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action is being brought under 41 U.S.C. §4712, *et seq.,* 29 U.S.C. §§ 2601 *et seq.* and 42 U.S.C. §§12101, *et seq*.

5.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

# FACTUAL ALLEGATIONS

**Background Regarding Defendant's Governmental Contracts**

6. Ostensibly, Microsoft is one of the largest governmental contractors providing IT services, products and staffing to local, state, and federal governmental agencies.

7. According to USASpending.gov, between January 1, 2018 and December 1, 2024 alone, Microsoft was/has been awarded at least 731 prime contracts and 301 prime subawards with various federal governmental departments (such as the Department of Defense) and agencies (such as the Securities and Exchange Commission) valued in the billions of dollars.

8. These figures do not take into consideration the contracts between Microsoft and various Government Sponsored Entities ("GSEs") such as the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Federal National Mortgage Association ("Fannie Mae"), corporations established by Congress more than fifty years ago. 12 U.S.C. §§ 1451 *et seq.* and 1716b.

9. Due to a worsening housing crisis and in response to the potential insolvency of Freddie Mac and Fannie Mae, in 2008, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), which, among other things, established the Federal Housing Finance Agency ("FHFA"), an independent agency of the Federal government with exclusive authority over Freddie Mac and Fannie Mae. 12 U.S.C. § 4511(b)(2).

10. In September 2008, Freddie Mac and Fannie Mae were placed into FHFA-administered conservatorships "in response to a substantial deterioration in the housing markets that severely damaged each Enterprise's financial condition and left both of them unable to fulfill their missions without government intervention". 12 U.S.C. § 4617(a)(2).

11. According to the Federal Government Fiscal Year 2022 Budget, as of March 31, 2021, the Treasury had paid $191.4 billion collectively to the GSEs under the SPSPAs and received more than $301 billion in dividend payments from the GSEs on the preferred stock.

12. Microsoft has repeatedly contracted and subcontracted with Freddie Mac/Fannie Mae through FHFA (and as funded by the Treasury) to provide various IT-related services and products.

**Defendant's "Speak Up" and Anti-Retaliation Policies for Employee Whistleblowing**

13. Microsoft touts it has "high ethical standards governing the way we conduct our business, standards that we also apply to our suppliers and business partners. Our business practices and standards reflect our commitment to making a positive impact around the globe. We demand such high standards from ourselves and our partners to preserve trust with our customers, governments, investors, partners, representatives, and each other, and because it is the right thing to do."

14. According to Microsoft, its "compliance and ethics program [is built] on three pillars: Prevention, Detection and Remediation".

15. "To prevent compliance issues from arising in the first place, [Microsoft] focus[es] on promoting a culture of ethics and integrity. We do this through creating a culture of compliance throughout our company, and through our Standards of Business Conduct, policies, and training, while also using data analytics, risk assessment, proactive investigations, third party vetting, and other compliance efforts to minimize potential risks."

16. Microsoft's "Trust Code" (Standards of Business Conduct) course is an annual, mandatory training course for all global, full-time Microsoft employees which uses live-action, episodic video to depict potential workplace situations covering all 24 Trust Code standards.

17. Microsoft trains its employees to "Pause, Think, and Ask," and to "Speak Up" as part of Microsoft's culture of trust.

18. The Trust Code provides: "We prohibit retaliation. It takes courage to speak up when something's not right. We understand that you might be uncomfortable or anxious. That is why we prohibit retaliation."

19. "We prohibit retaliation for: Refusing to do something that violates the Trust Code, Microsoft's policies, or the law, even if your refusal results in the loss of business to Microsoft.; Raising a concern in good faith about potential misconduct.; Cooperating with an investigation." *Id.*

20. Employees are encouraged to report their concerns of potential unlawful or unethical conduct by email, phone, fax, mail, or Microsoft's Integrity Portal via Microsoft's "Report a Concern" webpage: https://www.microsoft.com/en-us/legal/compliance/sbc/report-a-concern.

**Plaintiff's Employment with Defendant**

21. Microsoft hired Mr. Olson on or around June 16, 2021, as a Principal Project Manager within Microsoft's Industry Solutions Delivery ("ISD") division/ Financial Services based out of Dallas, Texas.

22. ISD is one of twelve (12) gross margin-generating business units within Microsoft.

23. ISD performed internal marketing to Microsoft Account teams (sales) who owned the entire account for Software Licensing / Cloud Computing.

24. ISD's value-add is in its skilled practitioners and Program Management who accelerated the adoption of Microsoft's Clouds with its customers, resulting in increased invoicing

for the Microsoft Account teams and generating significant monthly revenues with associated commissions.

25. When Mr. Olson joined Microsoft in June 2021, he brought more than twenty (20) years of IT-related project management experience gained from previous high-level positions with companies like Dell Technologies (Director of Product Engineering, IT, eCommerce); Accenture (IT Manager, Technology Architect Cloud, Senior Manager Digital Delivery Lead Architect eCommerce); Zivra, LLC (Director Technology Architect); and Akyzen, Inc. (Chief Technology Officer Technology Architect).

26. As a Microsoft Principal Project Manager, Mr. Olson had responsibilities for compliance, audits and meeting regulatory requirements, which was particularly significant for Microsoft's Financial Services customers or working directly with federal government agencies. For example, Microsoft customer Bank of New York Mellon, which was the custodian bank for the U.S. Department of Treasury.

27. Mr. Olson's performance objectives and core competencies were set around compliance and data security, and Microsoft trained Mr. Olson on its Security, Ethics, and Standards in Business Conducts.

28. Between 2022 and 2023, Mr. Olson received favorable performance reviews from his direct manager, Enrique Guzman Barron ("Mr. Barron").

29. As noted in the May 2023 review, Mr. Olson is a certified Project Management Professional (PMP) and earned his Executive MBA with Honors – key metrics of another of Microsoft's core competencies ("investment in himself and Microsoft's collective maturity").

30. Mr. Olson was also recognized for excellence by other leaders within the Microsoft organization.

**Plaintiff's FMLA Leave of Absence**

31. Shortly after receiving the glowing May 2023 performance review, in June 2023, Mr. Olson applied for a medical leave of absence between July to September 2023 due to a personal medical situation.

32. At the time, and as noted above, Mr. Olson had been assigned to four (4) high-level accounts/projects.

33. Microsoft approved his request, and it was designated as an FMLA leave of absence.

34. Mr. Olson returned from this FMLA-designated leave of absence on September 25th, 2023 without any restrictions.

35. Upon his return, Mr. Olson was surprised to learn that he had been removed from all four accounts and reassigned to other projects while he was on FMLA leave.

36. The reassignment negatively impacted Mr. Olson's billable utilization both during his FMLA leave for which Microsoft unfairly penalized Mr. Olson in his November 2023 performance review (covering the period May 2023 to November 2023).

37. And despite the previous highly favorable reviews and comments about Mr. Olson's contributions in his role as a Principal Project Manager and leader, Mr. Barron gave Mr. Olson negative feedback regarding his ability to "to position himself as the Program Manager everyone aspires to have that would drive differentiation, impact and prove ISD value on the account."

38. Upon his return from FMLA leave in September 2023, Mr. Olson also began noting data leaks, misrepresentations to clients and other serious compliance issues within Microsoft

while working on the contracted projects for Walmart, Citizens Bank, the NFL (Las Vegas Raiders), Wells Fargo Bank and Freddie Mac.

39. By way of example, when Mr. Olson was assigned to the Freddie Mac OpenAI Accelerator project as Microsoft's Principal Project Manager in December 2023, he almost immediately began identifying compliance issues, including Microsoft's failure to comply with Freddie Mac's criminal background screening and drug testing requirements.

40. One particular team member/Microsoft's Delivery Management Executive and program sponsor, refused to complete the requisite background check and drug test and neglected the Freddie Mac account, resulting in Mr. Olson having to field extensive complaints from the client.

41. Mr. Olson, and other team members, was also forced to leak sensitive data from Freddie Mac's workforce platform and asked to falsify a report to cover up fraud perpetrated upon Freddie Mac.

42. Mr. Olson raised his concerns and these issues internally as apparent from his numerous emails with/to Mr. Barron and the Freddie Mac OpenAI team members and externally to Freddie Mac as apparent from his numerous On Boarding Status Reports and Customer Facing Weekly Status Reports to this particular client.

43. Mr. Olson also escalated his concerns the issues during a February 13, 2024 Teams Chat which included a number of senior level Microsoft ISD personnel, including Mr. Barron.

44. During that Teams Chat, Mr. Barron and another manager, Susanna Henderson, advised Mr. Olson "not to contact a lawyer/CELA [Microsoft's Corporate, External, and Legal Affairs department] as they would "figure it out".

45. The next day, February 14, 2024, Mr. Olson met with his new skip-level manager/Microsoft Financial Services Practice Leader, Sydney Fleming ("Ms. Fleming") via Microsoft Teams to further escalate his concerns and the ethical and legal violations he had observed since his return from FMLA.

46. During that meeting with Ms. Fleming, Mr. Olson again identified issues related to financial reporting fraud risks, unethical sales practices, partner risks (including bribery and conflicts of interest related to certain Microsoft executives), Azure open AI chip shortages risks, federal government screening and security violations, and customer fraud as well as what he believed was FMLA retaliation.

47. In response, Ms. Fleming recommended Mr. Olson immediately notify Human Resources and Microsoft's Conduct and Compliance Team[1] in compliance with Microsoft's "Trust Code"/Standards of Business Conduct.

48. She also promised and reassured Mr. Olson that Microsoft prohibits retaliation against employees reporting potential unlawful and unethical conduct.

49. Within hours of the meeting, Mr. Olson's access to various computer systems related to the Freddie Mac project, including Freddie Mac's Beeline Extended Workforce Platform, was removed.

50. The next morning, February 15, 2024, Ms. Fleming sent an email follow up to Mr. Olson documenting the "need to disengage" him from Freddie Mac "immediately" because of Mr. Olson's "concerns about the work environment on the engagement" and because, according to Ms.

---

[1] Microsoft's Vice Chair and President (who reports directly to the CEO and Audit Committee of Microsoft's Board of Directors), serves as its Chief Compliance Officer and has overall responsibility for the management of its compliance and ethics program. The Vice Chair and President, through the Vice President and Deputy General Counsel of Compliance and Ethics, oversees the Compliance and Ethics team. The Deputy General Counsel has direct access and reporting obligations to the Audit Committee.

Fleming, Mr. Olson's "tone" in emails about the compliance issues had made "some team members" feel uncomfortable and added "tension within the team".

51. Mr. Olson's replacement on the Freddie Mac project was a female friend of Microsoft's Delivery Management Executive and program sponsor.

52. Roughly an hour after receiving Ms. Fleming's email on February 15, Mr. Olson reported the retaliation, ethical and legal violations and issues to Conduct and Compliance Team and Human Resources ("Workplace Investigation").

53. Microsoft's Compliance Team opened an internal investigation shortly thereafter ("Investigation 24-05061"), and on or about March 5, 2024, Mr. Olson met (via Microsoft Teams) with Investigations Senior Manager-Business Conduct Investigations Scott Brown and Alicia Cullen, an attorney in Microsoft's CELA to discuss the violations, his concerns and observations.

54. Mr. Olson also provided additional information to the Compliance Team on March 6, 2024 and March 7, 2024 and offered to have another phone call to discuss "to further analyze what actually happened AND make sure we all learn from this issue".

55. There was no additional follow up from the Compliance Team about Mr. Olson's complaint/reporting.

56. On April 30, 2024, Workplace Investigation notified Mr. Olson it had purportedly concluded its investigation of Mr. Olson's FMLA retaliation and discrimination claim and determined no discrimination, retaliation, or other illegal activity had occurred.

57. Mr. Olson provided further information to Workplace Investigation on May 7, 2024 regarding positions for which he was qualified but not considered, but Workplace Investigation disregarded the information with no further investigation or action.

58. Prior to filing suit, Mr. Olson, through counsel, requested the Confidence Team and Workplace Investigation requests and investigation documents, but Microsoft counsel refused without explanation.

59. Mr. Olson also reported the misconduct to the Federal Trade Commission on June 17, 2024. The Federal Trade Commission assigned report number 173944117.

60. Upon information and belief, Defendant Microsoft was/is made aware of Mr. Olson's report/complaint to the FTC.

61. As a direct result and consequence of his complaints and whistleblowing, Mr. Olson was again transferred off of the subject accounts/projects in retaliation for his protected activity by the very managers whom he reported had engaged in the improper activity and with specific regard to the

62. These reassignments, and their adverse impact on Mr. Olson's compensation, standing and professional reputation, were in direct violation of Microsoft's published non-retaliation policy.

63. As a further act of retaliation, on July 1, 2024, Mr. Olson was notified via a Human Resources email/unsigned "Job Elimination Notice" terminating his employment, purportedly due to the reorganization and restructuring of the ISD division, effective August 31, 2024.

64. According to the Notice, Microsoft's decision was based on "utilization attainment and how those mapped to the functions and jobs in the restructured organization" with input from Mr. Barron and others.

65. Though Mr. Olson never received any further information from Microsoft's Compliance Team about his reported complaint or confirmation that Investigation 24-05061 had been completed, Microsoft also indicated it planned to terminate Mr. Olson's email, corporate

network and building access by 6 PM on July 12, 2024 and require him to return all Microsoft property (including his computer) by that time.

66.     Microsoft clearly took these actions in retaliation and to conceal the reported misconduct, as Mr. Olson **was the only Consulting Project Management IC5/Level 65 employee (out of a group of seven others) who was being terminated due to the reorganization/restructuring of ISD**.

67.     Mr. Olson also reported his observations and concerns, including his wrongful termination/Defendant's retaliation, to the FTC on or about July 15, 2024.

68.     Upon information and belief, Defendant Microsoft was/is made aware of Mr. Olson's follow up report/complaint to the FTC.

69.     On January 31, 2025, the Federal Trade Commission confirmed Mr. Olson's further report was added to the database.

## COUNT I – VIOLATION OF THE FMLA

70.     Plaintiff incorporates each of the above allegations in this paragraph as if fully set forth herein.

71.     Plaintiff is an "eligible employee" under the FMLA.

72.     Defendant is a "covered employer" within the meaning of the FMLA.

73.     At all times relevant, Plaintiff performed his job duties successfully.

74.     Plaintiff gave notice of his intent to take medical leave and the need for same pursuant to company policy in June 2023.

75.     Beginning in September 2023 upon Plaintiff's return from medical leave, Plaintiff suffered multiple adverse employment actions taken by Defendant, including among other things receiving negative performance reviews after his return from FMLA leave; consideration of

Plaintiff's non-utilization during his FMLA leave to assess his billing utilization as low; transferring Plaintiff off significant projects to further undermine his utilization; penalizing Plaintiff financially for his low utilization; and ultimately, terminating his employment.

76. Defendant's conduct constitutes a violation of the Family and Medical Leave Act, 29 U.S.C. §2601, *et seq*.

77. As a direct and proximate result of said wrongful conduct, Plaintiff has suffered damages including, within the jurisdictional limits of this Court including, but not limited to, economic losses, loss of back pay, loss of front pay, loss of benefits, non-economic losses, emotional distress, damage to his professional reputation and career, and attorneys' fees.

78. Further, Plaintiff is entitled to an award of "liquidated damages" against Defendant under the FMLA, because Defendant's conduct was intentional.

## COUNT II – FMLA RETALIATION

79. Plaintiff incorporates each of the above allegations in this paragraph as if fully set forth herein.

80. At all times relevant, Plaintiff performed his job duties successfully.

81. In June 2023, Plaintiff availed himself of a protected right under the FMLA when he requested FMLA leave for a "serious health condition", which Defendant approved.

82. Beginning in September 2023 upon Plaintiff's return from medical leave, Plaintiff suffered multiple adverse employment actions taken by Defendant, including among other things giving negative performance reviews after his return from FMLA leave; consideration of Plaintiff's non-utilization during his FMLA leave to assess his billing utilization as low; transferring Plaintiff off significant projects to further undermine his utilization; penalizing Plaintiff financially for his low utilization; and ultimately, terminating his employment.

83. Plaintiff's decision to take medical leave, and the fact of his leave, was a negative factor in Defendant's decisions to impose adverse actions, and particularly, in terminating his employment.

84. Defendant's conduct constitutes a violation of the Family and Medical Leave Act, 29 U.S.C. §2611, *et seq*.

85. As a direct and proximate result of said wrongful conduct, Plaintiff has suffered damages within the jurisdictional limits of this Court including, but not limited to, economic losses, loss of back pay, loss of front pay, loss of benefits, non-economic losses, emotional distress, damage to his professional reputation and career, and attorneys' fees.

86. Further, Plaintiff is entitled to an award of "liquidated damages" against Defendant under the FMLA, because Defendant's conduct was intentional.

### COUNT III – RETALIATION AND WRONGFUL DISCHARGE IN VIOLATION OF FALSE CLAIM ACT

87. Plaintiff incorporates each of the above allegations in this paragraph as if fully set forth herein.

88. Defendant Microsoft is a contractor and subcontractor of the federal government.

89. Plaintiff reported what he reasonably believed was evidence of Defendant Microsoft's gross mismanagement, gross waste of Federal funds, an abuse of authority relating and violation of laws, rules, and regulations relative to the Fannie Mac regulation related to the Freddie Mac OpenAI project both externally to Freddie Mac officials and employees and internally to Defendant Microsoft management officials, CELA, and other employees with responsibility for investigating, discovering and addressing misconduct.

90. Defendant took several adverse actions against Plaintiff in retaliation for his protected activity, which ultimately culminated in Defendant terminating Plaintiff's employment for it.

91. At a minimum, Plaintiff's protected activity was a contributing factor in the unfavorable personnel actions taken against him.

92. Defendant's conduct constitutes violation of the False Claim Act, 41 U.S.C. §4712.

93. As a direct and proximate result of said wrongful conduct, Plaintiff has suffered damages within the jurisdictional limits of this Court including, but not limited to, economic losses, loss of back pay, loss of front pay, loss of benefits, non-economic losses, emotional distress and damage to his professional reputation and career, and attorneys' fees.

### COUNT IV – WRONGFUL DISCHARGE UNDER TEXAS STATE LAW (*SABINE PILOT*)

94. Plaintiff incorporates each of the above allegations in this paragraph as if fully set forth herein.

95. Pursuant to Texas state law, Plaintiff pleads a cause of action against Defendant for wrongful termination under the *Sabine Pilot* exception to the employment-at-will doctrine. *Sabine Pilot v. Service, Inc. v. Hauck*, 687 S.W.2d 733 (Tex. 1985).

96. By way of assignment of Plaintiff as Microsoft's Principal Project Manager in December 2023 to the Freddie Mac OpenAI Accelerator project, Defendant required Plaintiff to commit and engage in the various illegal, criminal acts as set forth above and/or be complicit in them and/or acquiesce in other Microsoft employees' commission and engagement in the various illegal acts.

97. Plaintiff refused to commit and engage in those various illegal acts, refused to be complicit in them and refused to acquiesce in other Microsoft employees' commission and

engagement in the various illegal acts; instead, he reported such unlawful and unethical conduct internally and externally.

98. Plaintiff was discharged by Defendant, and the sole reason for his discharge was his refusal to commit or engage in the unlawful act(s).

99. As a direct and proximate result of said wrongful discharge, Plaintiff has suffered damages within the jurisdictional limits of this Court including, but not limited to, lost wages, loss of back pay, loss of front pay, loss of benefits, lost future earnings, non-economic losses, emotional distress and damage to his professional reputation and career, and attorneys' fees.

100. Plaintiff also seeks punitive damages as a result of Defendant's malicious, reckless conduct surrounding Plaintiff's termination.

## COUNT V – PROMISSORY ESTOPPEL

101. Plaintiff incorporates each of the above allegations in this paragraph as if fully set forth herein.

102. Defendant requires employees to "read, understand, and comply with this Trust Code and the policies, laws, and regulations that apply to your job [and] speak up when [they] see possible violations of the Trust Code, Microsoft policies, and legal and regulatory requirements…"

103. As a matter of policy and procedure, Defendant routinely and repeatedly promised and assured Plaintiff verbally and in writing that it would not retaliate against him for "refusing to do something that violates the Trust Code, Microsoft's policies, or the law, even if your refusal results in the loss of business to Microsoft; raising a concern in good faith about potential misconduct; [or] cooperating with an investigation."

104. Defendant knew or should have known that Plaintiff would rely upon such anti-retaliation promises.

105. Plaintiff reasonably and substantially relied on Defendant's promises and reported his concerns about unlawful and unethical conduct occurring at Microsoft to his detriment, as Defendant took several adverse actions against Plaintiff in retaliation for reporting his concerns, which ultimately culminated in Defendant's termination of Plaintiff.

106. Plaintiff suffered damages as a result of reasonably and substantially relying on Defendant's promises, including, but not limited to, lost wages, loss of back pay, loss of front pay, loss of benefits, lost future earnings, non-economic losses, emotional distress and damage to his professional reputation and career, attorneys' fees and costs, and all other equitable relief.

## DEMAND FOR TRIAL BY JURY

Plaintiff Fredrick Olson hereby requests a trial by jury of all claims.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Fredrick Olson prays that Defendant Microsoft Corporation be cited to appear and answer herein and that, upon hearing, the Court award:

a. Actual damages, including lost wages, loss of back pay, loss of front pay, loss of benefits, lost future earnings;

b. Non-economic damages, including emotional distress and damage to professional reputation;

c. Punitive damages;

d. Reasonable and necessary attorneys' fees;

e. Costs of court;

f. Pre-judgment and post-judgment interest as allowed by law;

g. Such other and further relief to which Plaintiff may be justly entitled, whether at law or in equity.

        Respectfully submitted,

        **BELL NUNNALLY & MARTIN LLP**

        **By: */s/ Sydnie A. Shimkus***
        **Kenneth C. Meixelsperger**
        **State Bar No. 24031596**
        **Sydnie A. Shimkus**
        **State Bar No. 24093783**
        **2323 Ross Avenue, Suite 1900**
        **Dallas, TX  75201**
        **Telephone: 214-740-1400**
        **Fax: 214-740-1499**
        **KMeixelsperger@bellnunnally.com**
        **sshimkus@bellnunnally.com**

**Dated:  March 31, 2025**